UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1:18-cr-114 |
| v. ) | |
| ) | Judges McDonough/Steger |
| JON CHARLES VANCE ) | |

**REPORT AND RECOMMENDATION**

I.   **Introduction**

This matter is before the Court on Defendant Jon Vance's Motion to Suppress [Doc. 100]. For reasons that follow, it is **RECOMMENDED** that Defendant's Motion be **DENIED**.

By way of summary, Defendant Vance relies upon the Fourth Amendment's prohibition against unreasonable search and seizure. In this case, Vance and his girlfriend arrived at the Wal-Mart in Collegedale, Tennessee, in a white pick-up truck. They were later arrested for attempted shoplifting, and the police seized and impounded the truck. Officers then obtained a warrant to search the truck where they recovered digital scales and methamphetamine. The undersigned finds that the police officers had probable cause to seize the truck, and further, that Vance abandoned any privacy interest in the vehicle.

II.   **Facts**

Defendant Jon Vance and girlfriend, Connie Beltran, arrived at the Walmart in Collegedale, Tennessee, in a white pick-up truck. They entered the store, grabbed a shopping cart, and gathered several items. At some point, Vance and Beltran left the store, went into the parking lot, and then re-entered the store. When Vance and Beltran re-entered the Wal-Mart, they continued shopping. They then took their shopping cart to the self-checkout register where they scanned some of the items and intentionally failed to scan other items. The non-scanned items were placed in the

shopping cart—presumably with the intention of taking them without paying. Vance and Beltran then pushed the shopping cart to the exit doors.[1]

Without the knowledge of Vance and Beltran, Wal-Mart security personnel were surveilling and video-recording their actions. As a result, Wal-Mart security notified police and stopped Vance and Beltran as they approached the exit doors. Upon being confronted by Wal-Mart security, Vance and Beltran abandoned their items, exited the store, and began running away.

The Collegedale Police Department received a call from Wal-Mart Security. Corporal David Holloway, Officer Gienapp, and Officer Strange—all with the Collegedale Police Department—were already in the area when they were dispatched to respond to the call. Consequently, they arrived almost immediately at the Wal-Mart parking lot. Holloway and Gienapp were in one patrol car; Strange in another.

Dispatch informed the officers that the two suspects were fleeing on foot. Upon arrival at the Wal-Mart parking lot, the officers spotted Vance and Beltran running away from the store. Strange chased Beltran, who surrendered after ignominiously falling into a briar patch.[2] Meanwhile, Officers Holloway and Gienapp gave chase to Vance—a chase that ended in a similarly desultory manner when Vance was caught trying, unsuccessfully, to scale a high fence.

Officers put Beltran in one squad car and Vance in another. When Officer Strange questioned Beltran as to how she got to the store, Beltran explained that she and Vance arrived in a white pick-up truck. She also stated that she and Vance had used methamphetamine the previous evening. When Vance was questioned, he was more evasive. He said that he was dropped off by

---

[1] It was later determined that Vance and Beltran attempted to steal over $600 worth of goods, which is a Class A misdemeanor under Tennessee law. *See, e.g.*, Tenn. Code. Ann. § 39-14-105(a)(1) ("Theft of property . . . is . . . [a] Class A misdemeanor if the value of the property . . . obtained is one thousand dollars ($1,000) or less . . . .").

[2] The Court does not know whether Ms. Beltran was steeped in Uncle Remus folklore and sought to make good her escape by entering the briar patch; however, not being Br'er Rabbit, it did not end well for her.

his friend in a white compact car and did not have a vehicle in Wal-Mart's parking lot. When officers searched Vance, they found a broken-off GMC key as well as $1,600 in cash. Vance refused to provide any explanation to the officers about the key. But, he did admit to using marijuana and methamphetamine.

While Officer Strange remained with Vance and Beltran, Officers Holloway and Gienapp went into the store to meet with Wal-Mart's loss-prevention specialist about these events. The specialist told the officers that Vance and Beltran were "skip scanning"—a descriptive phrase for a shoplifting scheme where a customer scans and pays for some items, but not others, at a self-checkout register. The specialist then showed the officers security footage that depicted Vance and Beltran "skip scanning."

The officers also observed video footage of the Wal-Mart parking lot. Consistent with Beltran's story, they observed a video recording of Vance and Beltran entering the parking lot in a white GMC pick-up truck, exiting the truck, and walking into the store. Officers watched additional video footage of Vance and Beltran walking through the store and gathering various items. At one point in the video, Vance and Beltran are seen leaving store, walking into the parking lot, and returning to the store to obtain more items.

After watching the security footage, Officers Holloway and Gienapp returned to the parking lot to located the pick-up truck. Officer Gienapp opened the door and discovered a broken-off key in the ignition. The half-key that he had already recovered from Vance was a perfect match with the broken key in the ignition of the truck. He mated the two pieces of the key, turned the ignition, and started the truck. With this confirmation, Officer Holloway instructed Officer Gienapp to turn off the truck and leave it until they could get a search warrant; Gienapp complied.

From his patrol car, Officer Holloway performed a database search of the truck's VIN and license plate. The search results reflected that neither Vance nor Beltran was the owner of the vehicle. Holloway then ran a search for outstanding warrants against Vance and Beltran and found that they both had outstanding arrest warrants. Holloway returned to the Wal-Mart store and asked the loss-prevention specialist what he wanted the police to do with the white pick-up truck. The specialist requested that the truck be removed from Wal-Mart's property. Officer Holloway contacted a wrecker and had the truck towed to the police department's impound lot.

Although Officer Holloway presumably could have performed an inventory search on the impounded vehicle, he elected not to do so. Instead, Officer Holloway obtained a search warrant from the local municipal judge. Armed with the signed search warrant, Officer Holloway—accompanied by a detective—searched the truck. During the search, officers uncovered digital scales as well as crystal methamphetamine.

The Government charged Vance with the following: (1) conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine and 500 grams or more of a mixture and substance containing methamphetamine under 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; (2) possession with intent to distribute five grams or more of methamphetamine under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2; and (3) possession with intent to distribute 50 grams or more of methamphetamine under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. [Indictment, Doc. 1].

In his motion to suppress, Vance argues that the initial seizure of the truck was unconstitutional and that all evidence derived from the search of the vehicle—which search was conducted under the authority of the search warrant—should be suppressed. [Doc. 100]. The Government responded that Vance had no privacy interest in the truck because: (1) he never

claimed ownership of it [Doc. 119]; and (2) the police had probable cause to seize the truck based upon the circumstances [*Id.*]. Beyond that, the Government conceded that, even if the Court were to rule that the seizure was illegal and the search warrant insufficient, the good-faith exception would apply. [*Id.*].

**III.    Discussion**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "A warrantless search or seizure is 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). *See United States v. Sweeney*, 891 F.3d 232, 235 (6th Cir. 2018) (citing *California v. Carney*, 471 U.S. 386, 390)). One exception to the warrant requirement—the so-called "automobile exception"—permits a warrantless search of an automobile if there is "probable cause to believe that instrumentalities or evidence of a crime may be found in the vehicle to be searched." *United States v. Graham*, 275 F.3d 490, 509 (6th Cir. 2001). There is "no requirement of exigent circumstances to justify such a warrantless search." *United States v. Johns*, 469 U.S. 478, 484 (1985).

Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Graham*, 275 F.3d at 509 (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (internal quotation marks omitted). Determining whether probable cause existed at the time of the search is a "commonsense, practical question' to be judged from the 'totality-of-the-circumstances." *Smith v. Thornburg*, 136 F .3d 1070, 1074–75 (6th Cir. 1998) (quoting *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994) (internal

quotation marks omitted)). When assessing probable cause, courts "may not look to events that occurred after the search or to the subjective intent of the officers;" rather, the Court must only "look to the objective facts known to the officers at the time of the search." *Id.* at 1075.

### A. Probable cause existed to seize the pick-up truck

Fourth Amendment jurisprudence typically segments a search and seizure into three parts: (1) the initial seizure; (2) the search; and (3) the scope of the search. For purposes of this case, neither the search nor the scope of the search are in dispute. Rather, Vance contests the legality of the initial seizure. Specifically, Vance argues that the Collegedale police officers lacked probable cause to initially seize the white pick-up truck in which he arrived. The Court disagrees.

Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Only "the probability, and not a prima facie showing, of criminal activity is the standard." *Spinelli v. United States*, 393 U.S. 410, 419 (1969). In this situation, the police officers reviewed video footage showing that Vance and Beltran had arrived at the Wal-Mart in the white pick-up truck; Vance provided evasive answers in response to police questioning as to how he arrived at the Wal-Mart; those answers were inconsistent with the video footage observed by police officers; there was strong evidence—including video footage—that Vance had shoplifted items through a "skip-scanning" scheme; and the police officers observed security footage reflecting that Vance and Beltran had earlier shopped for items, walked to the white pick-up truck, and re-entered the store to continue shopping. Based upon this evidence, the Court finds that there was, at a bare minimum, a "fair probability" that shoplifted goods or evidence of shoplifting were located in the pick-up truck at the time officers seized it. *Id. See United States v. Christenson*, 549 F.2d 53, 57 (8th Cir. 1977) ("reasonable to infer that [suspect] removed the stolen items . . . by the only apparent means

of transportation available to him and that the contraband would still be in the automobile"). *See also United States v. Caroline*, 791 F.2d 197, 201 (D.C. Cir. 1986) (holding that the police had probable cause to search defendant's automobile where they had witnessed defendant and a companion using the car during their shoplifting spree and there was a "'fair probability' that shoplifted goods, or evidence of shoplifting, were in the car at the time of the search.").

In addition to possible shoplifted items being placed in the truck by Vance and Beltran, law enforcement's probable cause was strengthened by the fact that neither the truck's license-plate number nor the VIN was registered in either Vance's or Beltran's names. *See, e.g.*, *United States v. Ott*, 202 F.3d 270 (6th Cir. 2000) (finding that officers had probable cause because, among other factors, "[t]here was some indicia of suspicion surrounding the vehicle[—]the license plates and VIN did not match the apparent make of the vehicle.").

### B. Vance abandoned any privacy interest in the pick-up truck

As indicated, the Court finds that the police officers were justified in seizing the truck because there existed a fair probability that Vance had hidden shoplifted items in the vehicle. However, even if the police officers had lacked probable cause to seize the truck, Vance abandoned any expectation of privacy that he might have had in the truck.

Police officers generally do not need a warrant or probable cause to search or seize abandoned property. *United States v. Eden*, 190 Fed.App'x. 416, 421 (6th Cir. 2006) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)). The term "abandonment," in this context, does not refer to traditional concepts of property law. *United States v. Tolbert*, 692 F.2d 1041, 1044 (6th Cir. 1982). The capacity to claim Fourth Amendment protection, instead, depends "upon whether the person who claims the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).

7

The concept of expectation of privacy includes two elements: "the individual, by [their] conduct, has 'exhibited an actual (subjective) expectation of privacy,' . . . [and] the individual's subjective expectation of privacy is 'one that society is prepared to recognize as 'reasonable[.]'" *Tolbert*, 692 F.2d at 1044 (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)). Applying those concepts, the Court must assess whether Vance exhibited a subjective expectation of privacy in the pick-up truck and, second, whether his subjective expectation of privacy was justified.

With respect to the first element, Vance never showed a subjective privacy interest in the truck. His words and actions reflected a clear intent to abandon the vehicle. Within the context of abandonment, the focus is on "whether [the property holder's] outward manifestations demonstrated that [they] sought to preserve the [property] as private, through the prism of a reasonable officer." *Eden*, 190 Fed. App'x. at 425; *see United States v. Dillard*, 78 Fed. App'x 505, 510 (6th Cir. 2003) ("Abandonment is primarily a question of intent, and intent may be inferred from words, acts, and other objective facts.").

The burden lies with the government to show "by a preponderance of the evidence that a 'defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished [their] interests in the item searched or seized.'" *Eden*, 190 Fed.App'x. at 423 (quoting *United States v. Basinski*, 226 F.3d 829, 836-37 (7th Cir. 2000)). In other words, the government must establish that the person's "voluntary words or conduct, or any other manifestations of [their] intent, would lead a reasonable person in the [officer's] position to believe that [they] relinquished [their] property interest in the [property]." *Eden*, 190 Fed.App'x. at 426. If a person disclaims ownership of the property, they have not exhibited the necessary expectation of privacy in it. *Compare Tolbert*, 692 F.2d at 1048 (finding abandonment when defendant left checked luggage in airport and disclaimed ownership of the

luggage), *with United States v. Sanders*, 719 F.2d 882, 886 (6th Cir. 1983) (finding no abandonment when defendant left checked luggage in claim area, explained she was not going straight home, never denied ownership of the luggage, and refused to consent to a search).

*United States v. Tolbert* is instructive. In that case, government agents approached Tolbert as she was entering a taxicab after leaving an airplane, apparently intent on departing the airport without her luggage. The Sixth Circuit noted that "[t]his fact alone would not support a finding that she maintained no subjective belief that her bag was secure from government intrusion. An individual may depart from an airport without claiming her luggage for a variety of reasons, with full and legitimate intent to return and claim the baggage." 692 F.2d at 1044. Yet the appellate court found dispositive the fact that Tolbert insisted to authorities "that she was traveling without luggage and specifically disclaimed ownership of the bag in issue." *Id.* at 1044-45. The appeals court noted that "because, by her actions and vigorous oral disclaimers, Tolbert affirmatively indicated that she had no interest in preserving the secrecy of the contents of the suitcase, she had no legitimate expectation of privacy therein." *Id.* at 1045. In other words, the Sixth Circuit found that Tolbert had no Fourth Amendment right to object to the search of the suitcase in which she had no legitimate expectation of privacy. *Id.* at 1044–45.

Similarly, in *United States v. Frazier*, the Sixth Circuit addressed whether a defendant had abandoned an unchecked bag when his companion left it on the floor while speaking to law enforcement agents at an airport. 936 F.2d 262, 264-65 (6th Cir. 1991). When the detective asked the defendant about the bag, he denied that it was his; the appeals court found that the defendant's disclaimer constituted abandonment. *Id.* at 265.

Like the *Tolbert* and *Frazier* defendants who disclaimed their property, Vance too cannot demonstrate that he had a subjective expectation of privacy in the white pick-up truck seized by

the police officers. Vance told authorities that he arrived at the Wal-Mart in a white compact car and did not have a vehicle in the parking lot. This proved to be untrue. Surveillance video confirmed that Vance arrived in a white pick-up truck and parked it in the Wal-Mart parking lot. By denying the pick-up truck's existence, Vance abandoned any subjective expectation of privacy in the truck. For that reason, the Collegedale police officers did not need a warrant or probable cause to seize the pick-up truck. *See Eden*, 190 Fed. App'x. at 421.

IV. **Conclusion**

The Collegedale police officers had probable cause to seize the pick-up truck because a fair probability existed that it contained stolen items from the Wal-Mart. Further, when Defendant expressly disclaimed the white pick-up truck, he abandoned any privacy interest he may otherwise have had in the vehicle. For these reasons, the Court **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 100] be **DENIED**.[3]

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 149 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370 (6th Cir. 1987).